MAXIMILIAN v. MAYOR OF NEW YORK, appellant.

*Municipal corporation — when not liable for acts of independent department of local government — New York city — not liable for negligence of servant of commissioners of charities.*

The department of public charities is (Laws of 1870, chap. 137) one of the departments of the city of New York. It is under the management of five commissioners who are appointed by the mayor, to whom they are required to report. But they have exclusive control of the department, and are not responsible to the corporate authorities of the city for their acts. *Held*, that an employee of the department was not a servant of the city and the city was not liable for the death of a person caused by the negligence of such employee.

APPEAL from a judgment in favor of plaintiff, and from an order denying a new trial. The action was brought by Rosalie Maximilian, administratrix of the estate of Max K. Maximilian, deceased, against The Mayor, Aldermen and Commonalty of the city of New York to recover damages for the death of plaintiff's intestate, who was run over and injured, so that he died, by an ambulance driven by an employee of the commissioners of public charities and ·corrections of the city and county of New York. The principal question and the only one discussed in the opinion was, whether the ambulance driver was a servant of the defendant.

The jury found in favor of plaintiff, and gave $5,000 damages.

*E. Delafield Smith*, for appellant.

*Birdseye, Cloyd & Bayliss*, for respondent, cited upon the question of defendants' liability for the negligence of the ambulance driver, *Bissel* v. *M. S. & N. I. R. R. Co.*, 22 N. Y. 258 ; *Parish* v. *Wheeler*, id. 494 ; *Thayer* v. *City of Boston*, 19 Pick. 516 ; Ang. & Ames on Corp. 1–7, 304 ; *Lee* v. *Village of Sandy Hill*, 40 N. Y. 442, and cases cited at p. 447; *Gardner* v. *Board of Health of New York*, 10 id. 409 ; *People* v. *Supervisors of Monroe*, 18 Barb. 567 ; *Clarissy* v. *Metropolitan Fire Department*, 7 Abb. N. S. 352 ; *Mayor of New York* v. *Bailey*, 2 Den. 433 ; *Mayor of New York* v. *Furz*, 3 Hill, 612; *Rochester White Lead Co.* v. *City of Rochester*, 3 N. Y. 463 ; *Delmonico* v. *Mayor of New York*, 1 Sandf. 122 ; *Mayor of Lyme Regis* v. *Henley*, 5 Bing. 222 ; *Lloyd* v. *Mayor of New York*, 5 N. Y. 369 ; *Lacour* v. *Mayor of New York*, 3 Duer, 406.

DANIELS, J. This action was brought to recover the pecuniary loss sustained by the next of kin of the intestate, in consequence of his death being caused by the negligent act of an ambulance driver, at the time claimed to have been the servant and in the employment of the defendant. The death of the intestate was not claimed to be attributable to any act or agency of the defendant, beyond. that performed by the driver. For that reason, if he was not at the time in the defendant's service, no liability for his negligent act was established against the defendant: *Blake* v. *Ferris*, 5 N. Y. 48; *Pack* v. *Mayor of New York*, 8 id. 222; *Kelly* v. *Mayor of New York*, 11 id. 432.

At the time when the accident happened, which was in May, 1871,

the ambulance colliding with the intestate, by which the injuries were produced, which caused his death, was under the direction of the commissioners of charities and correction of the city of New York, and the driver in charge of it seems to have been in their employment.

The evidence upon these subjects is quite slight, as it has been presented by the case, but nothing more was shown from which it could be inferred that either the ambulance or its driver was in the employment of the defendant. If he sustained, at the time, the relation of servant to the defendant, in any sense whatever, it was wholly due to the circumstance that he was employed by and in the service of the commissioners.

It becomes necessary, therefore, as the objection was explicitly taken at the trial, to ascertain and determine whether such employment and service, in any legal sense, rendered the driver, at the time, the servant of the defendant. For if it did not, no liability was established by the evidence, and the judgment, consequently, would be erroneous.

The department of charities and corrections was created in 1860, by chapter 510 of the session laws of that year. It was not then made a department of the government or corporation of the city, but was declared to be created in the city and county of New York. And it was then constituted by four commissioners to be appointed for five years by the comptroller of the city. The commissioners, when appointed, were constituted a board of control over the department created, and the books, accounts, vouchers, records, and all the property of the alms-house department were directed to be transferred to their keeping and custody for the use thereafter of their department, while the property itself continued to be owned by the defendant. The new department was then empowered and directed to possess and exercise *full and exclusive* powers for the government, management, maintenance and direction of the several institutions, buildings, premises, property and appurtenances which preceding their appointment were under the control of the board of governors of the alms-house, including the alms-house, work-house, nurseries for poor and destitute children, the county lunatic asylum, the Potter's field, the penitentiary, city prison, and houses of detention, except the house of refuge, juvenile delinquent asylum, house of detention for witnesses and sheriff's jail; and the property and places so assigned to them were designated as

the institutions of the public correction and charities. Laws of 1860, chap. 510, § 4. The department was then empowered by its commissioners to appoint and remove, or by rules provide for the appointment or removal of such subordinate officers as it should see fit for the purpose of distributing its powers of *government, manage-ment* and direction ; define their respective duties and authority, and fix their respective designations of office, and prescribe their compensation. And the commissioners were further given all the powers of the preceding alms-house commissioners and governors. Id., § 5. They were also given authority to make rules and by-laws for the management and government of the department and of each institution as should seem to them necessary, not inconsistent with the act or the laws of the State. Id., § 16. And they were empowered to alter and repair their buildings and erect others when in their judgment necessary or expedient. Id., § 17. And the board of supervisors were to annually raise and collect, by tax on the real and personal property of the city and county, such sum of money as the commissioners should from time to time require for their department in the execution of their powers, which was to be applied by them to the purposes of the act. Id., § 20. They were also given the control of the poor and of the other persons confined in the institutions under their government and management.

By the amendments made to the charter of the city of New York in 1870, the department of public charities and corrections was made one of the departments of the city. The commissioners were increased to five in number and the power of their appoint-ment was vested in the mayor, instead of the comptroller, who previously possessed it ; and after that they were required to report to the mayor. Laws of 1870, chap. 137, §§ 30, 32, 80. But their powers and duties were in no essential respect changed, for that act provided that the board should still possess all the powers and discharge all the duties conferred upon the department by the act of 1860, and acts and parts of acts amendatory thereto except as modified or repealed by the law then enacted. Id., § 80. And that made no other substantial changes than those already mentioned in either of them.

These laws created a department of charities and correction, with powers and duties of an independent nature in nowise within the control of the defendant, unless other provisions and regulations might become necessary for its more complete organization and the

perfection of its powers and duties. If they did, then the common council of the city was required to provide them by ordinance. But even that body was denied the power of passing any ordinance regulating the internal affairs of the department, except upon the previous written application of the head of the department. Laws of 1870, chap. 137, § 102.

Under these laws the entire management and government of the department was confided to the commissioners, and that including the appointment, control and direction of all subordinates employed in it. They were solely and exclusively the servants and subordinates of the commissioners as public officers whose powers and duties were prescribed by the laws of the State. Among them was necessarily included the driver, by whose careless act the intestate lost his life. These commissioners were not in the service of the defendant, but of the public, having their own functions and authority prescribed and defined by the laws of the State. Neither the mayor nor the common council, nor both combined, nor any other officer of the city could control, restrain or direct them. They were not responsible to any power but the laws for the manner in which their authority should be exercised, and their servants and subordinates were subject alone to them and their rules, regulations and commands. They were in no proper or legal sense the servants or subordinates of the defendant. It had no power to employ, control, direct or manage them, and of necessity it could not therefore be liable for their acts or omissions.

In the case of *Martin* v. *Mayor of Brooklyn*, 1 Hill, 545, COWEN, J., says that "No case has been cited wherein it has been holden that municipal corporations are liable for omissions of a duty specifically imposed by statute on one of their officers. In this respect the latter are *quasi* civil officers of the government, though appointed by the corporation. The relation of master and servant does not exist between the corporation and officers." Id. 551. In the case of *Mayor of New York* v. *Bailey*, 2 Den. 433, the correctness of this principle was conceded, but the city was held liable because it instructed the commissioners to proceed with the work, and for the further reason that it was constructed on the defendant's land. Id. 444–5. Senator HAND in the course of his opinion held that "municipal corporations, though not liable for the acts of independent officers whose duties are specifically prescribed by law, though appointed by them, have been held liable for the acts of their officers and agents. of whom they have the appointment

and supervision, and when the duty to be performed was for the benefit of the corporation. On the other hand, where such a corporation is bound to appoint an officer for the performance of a public duty, it is not liable. Neither is an individual who in the performance of a public duty is obliged to appoint third persons to perform labor for the public liable for their acts unless in cases of personal supervision, so long as they keep within the scope of their authority." Id. 447–8. The president of the senate in his opinion held, that "At the common law where an agency exists the principal becomes responsible for the acts of his agent, because he has the right to employ and the authority to control him ; where the right of employment and the authority to control are both wanting, no agency can exist, for the acts of the agent cannot in such a case, upon the principles of common law or common sense, become the acts of the principal." Id. 453. The decisions made in *Lorillard* v. *Town of Munroe*, 11 N. Y. 392, and *Cosgrove* v. *Ogden*, 49 id. 255, confirm this view, and there is nothing inconsistent with it in *Gardner* v. *Board of Health*, 10 id. 409. For all that was there held was that the board could not be sued as a corporation, and it does not follow from that by any means that its members could not be sued as individuals and rendered liable in such suit for the consequences of the misconduct of those subordinately employed by them. The case certainly contains nothing sanctioning the liability of the defendant in the present action.

In Massachusetts the rule of the common law, as it has been understood in this State, has been adopted. *Hafford* v. *New Bedford*, 16 Gray, 297; *Walcott* v. *Inhabitants of Swampscott*, 1 Allen, 101; *Fisher* v. *Boston*, 104 Mass. 87. And it follows from it, that the defendant was not liable for the act of the ambulance driver, by which the intestate received the injury from which he afterward died. For that reason, it cannot be necessary to consider the other objections made to the plaintiff's right to recover. The judgment and order denying a new trial should be reversed, and a new trial ordered, with costs to abide the event.

*Judgment reversed, and new trial granted.*

NOTE.—See *Deyoe* v. *Village of Saratoga Springs*, 3 N. Y. Sup. 504, which seems to hold a contrary doctrine. In that case plaintiff was injured in consequence of the negligence of the commissioners of the water-works of Saratoga Springs in leaving open and unguarded a ditch in the streets of the village. The commissioners were appointed by the legislature and had control of the village water-works. *Held*, that the village was liable for the negligence of the commissioners. *Ham* v. *Mayor of New York*, 5 Jones & Sp. 458, supports the doctrine of the principal case. — REP.